The first case is Stembrowski v. Walker. Good morning, Your Honors. Philip Kim for Appellants. The ruling of the District Court should be reversed because our complaint adequately alleged strong inferences I enter by demonstrating specific red flags with respect to the issuer here, Sue Byes, cash position. All we have to do is look at the 2010 audit. Now, prior to the 2009 and 2010 audit, it's undisputed that the auditor defendants were aware of a material internal control deficiency such that they could not solely rely on the representations of the company in performing its audit in connection with the company issuing public statements. Why is it enough that DNTW expressly disclaimed providing any opinion concerning the internal controls and actually sometimes sought confirmation of Sue Byes' finances from outside sources? Our case is not focused on the fact about statements about the internal controls. We mention that because if the auditors are aware of this weakness that they cannot rely solely on management to perform its job, therefore they had knowledge that they had to do something more than rely on the representations of the company. Why isn't the more compelling inference that DNTW tried to compensate for some of these deficiencies and just did a very poor job of it? Well, you have to look at an example. There's the $18.8 million transaction. There, the CFO of the company lied to the auditors. They claimed that this money, which was nearly half of the revenue that the company supposedly made in 2010, they said that this money was held with third-party agents. But in that case, you're looking at the $18.8 million. And isn't that an instance where DNTW ultimately insisted that this amount be booked as a marketing expense instead? They did, but they relied solely on the account of what happened from the CFO. They never confirmed whether that cash even existed at all, whether there was even $18.8 million in revenue for that particular year. And at the same time, when they were confronted with that fact, that DNTW itself loosened its audit procedures. Usually, when you're confronted with a suspicious fact, you're not loosening your audit procedures. For an inexplicable reason, they allowed SUBI to confirm cash balances themselves, not from what they had done previously, from bank statements, direct from the banks. And there were additional red flags at the same time. There was an issue with the $8.1 million of supposed deposits that were made in 2009. By 2010, when they were conducting their audit, that $8.1 million wasn't refundable. They had to write off most of it. It was about $1.9 million they got back. They didn't ask any further questions. They were duty-bound when they saw these red flags, which included the $18. some million of cash that supposedly is now an expense. I mean, if you think about it, it doesn't even make any business sense. You're a company. You're going to park $18.8 million with your third-party sales agents, which the company claims that they have no control over. It just didn't make any sense. And what was also going on at the same time, from 2008, 2009, and 2010, the company kept reinventing itself. They kept changing businesses. By 2010, they had abandoned their... How does that go to the issue of whether the accountants were negligent on one hand, or knowingly fraudulent, engaged in fraud with Sienta on the other hand? It's important because... A company can change its marketing efforts, can reinvent itself. They could. They could. However, when you consider that with the red flags with respect to cash, it has to raise the auditor's questioning. They had a duty to inquire further, especially when they knew from the get-go for two years, 2009 and 2010, that they could not solely rely on the company. They had to do more. They should have asked the third parties. If they had reached out to the third parties that supposedly had the $18.8 million in cash, they didn't exist. We know at the end, when we did the autopsy, I guess, when the fraud was exposed, the company had no business at all. That's the issue. A lot of this is from hindsight, and hindsight, yes, the issue is going forward on an ongoing basis that they have Sienta. I think what distinguishes this case from the other cases that have been cited by both sides and even by the district court, you have a situation when they knew going into it that they had to do more, and they did not adjust their policies to address it. In fact, they adjusted their policies so it made it easier for the company to conduct the fraud. They, for whatever reason, it's unknown, for 2009 and in 2010, they allowed the company to verify its cash balances from documentation from the company, no longer from the banks. You would, a reasonable auditor, and the standard is, a red flag is what puts a reasonable auditor on notice that there's misconduct. Certainly in 2010, when they were faced with these red flags, they should have been like, you know what, maybe we should confirm the cash direct from the banks. They didn't do that. We don't know why they didn't do that. They're sloppy. I believe in this case, this is a situation where it went beyond negligence, but it was reckless, deliberately reckless conduct, or that they turned a blind eye because they knew from the beginning they couldn't rely on management's representations. Now, there's an argument that says, well, we sent out accounts receivable confirmation. So, you know, we did something. The problem with that is, is there were four accounts receivable confirmations in 2010 that were not received from the independent parties, but were received from Subai's bookkeeper. And they did nothing in response to that. They didn't follow up with those four account receivables confirmations and say, hey, why is this coming from your bookkeeper? This is supposed to come from your customers. The other thing is, there were 10 accounts receivable confirmations that were all returned within 11 days. And one of the defendants, one of the audit partner defendants in this case said that was unusual. But again, they didn't do anything. And the thing is, is that they got some confirmations more expeditiously than they normally would. Is that a red flag? I think when you consider it with the five or six other red flags that we have for 2010, it is. All the suspicious facts, they all point in one direction, that there's something going on with cash. We can't just accept the company's explanation. The CFO of the company told the auditors, yeah, we have $18.8 million and we want to book that as an asset. And by the way, it's held by these third-party sales agents that we have control over. With some prodding, you know, the record's clear. Yes, they did ask questions. They did ask questions of Mr. Crane and caught him in a lie saying, oh, by the way, we don't have control. Therefore, the auditor said, well, you know what? That needs to be a liability. But the problem with that is they never confirmed whether that $18.8 million ever existed at all. Now, if that was the only fact in our case, I would agree with the panel's doubts. You know, is that alone a red flag? But we had the $8.1 million issue. We have the accounts receivable issues and we have the fact that the company kept changing its business. Now, there's that advanced battery case that I think has been cited, involved a Chinese auditor. In that case, the court affirmed the dismissal of the district court. But there's some language there that said, well, one of the arguments in the case was that the company had really high margins and that was a red flag. But it said, you know, that wasn't a red flag as to what went wrong in that case, but that may have created the duty for the auditor to ask more questions based on the growing margins. And I think that's similar to this case where you had a company that kept changing businesses, inexplicably abandoning, you know, one of its more profitable businesses to get into something else, and yet still increasing revenue. That should have created some suspicion. That should have created a duty for them to inquire further. And they didn't. And there were other facts. I see that my time is running out. Unless the panel has any additional questions, I'll sit down. Thank you. Thank you. Good morning. John Eickemeyer from Vetter Price for the Appellees. The court below took a holistic approach to this matter and painstakingly evaluated, in two separate opinions, the alleged facts that plaintiffs contend give rise to the requisite strong inference of scienter, which means, in the case against an auditor under section 10B, that the auditor must have intended actually to aid the client's fraud. Well, let me ask you this, if I could. You've got the 2009 10-K filing, which states, and I'm quoting from the appendix, the AA 214, states that its management concluded that, this is Zubayas' management, that its management concluded that our internal control over financial reporting was not effective as of September 30th, 2009, due to the existence of significant deficiencies constituting material weaknesses. And you've got the 2010-K filing, which, as you know, has something quite along the same veins. And I think we can assume that DNTW and the Walkers read these 10-Ks. Why wasn't it reckless for them to, why wasn't it reckless, not reckless for them to say, okay, we know that you don't have good internal controls, but nonetheless, we're going to accept whatever you say and sign off on these financials? Well, because that's, DNTW didn't accept what Zubayas said, and just sign off on the financials. The complaint itself, as the district court recognized, showed in a number of instances that there was an actual audit done. And we had just had some discussion of that $18.8 million item from the 2010 audit. In that case, Zubayas came to them and said, okay, we've got this cash that's being held by the sales agent. And DNTW asked for, questioned it, challenged the assertion, eventually forced Mr. Crane, who was the CFO at the time, to say, well, we don't really have control over the cash. And DNTW said, in order for us to issue an opinion here, you've got to reclassify that. And you've got to reclassify it from an asset on your balance sheet to an expense. And the effect of that, the effect of DNTW's insistence, was to drastically reduce the asset base of the company, and to greatly reduce its profitability by increasing its expenses for 2010. Similarly, with regard to the deposits with the vendors for the supposed inventoriable assets, DNTW said, we need to see the contracts. And they obtained the contracts. Now, did DNTW perhaps not properly interpret the contracts? Did they not understand or not see that the refundability provisions were not there or not adequate? Maybe so. But that's negligence. That's not scienter. Scienter... Why isn't that the CFO, Chief Financial Officer, lying to them? Well, if they've gone out and they've gotten the contracts, and they've accepted and they've received the contracts, they are looking at them, they didn't just accept what the CFO said. It may be that they should have been more skeptical. CFO lied to them about their refundability of the 8.1. But they did not know that at the time. Yes, the CFO did lie to them. But as the district court found, they attempted to do an audit here. They did try to confirm, sent out receivable confirmations, received them back again. Perhaps some of the circumstances were unusual. I take it you'll, I won't take it. The audit was negligent at best, correct? I would say the district court may have been on good ground when it said there was evidence to infer that it was a substandard audit, yes. You say that at DNTW expressly declaimed providing any opinion concerning the internal controls. And of course they did say that. But is such a disclaimer by itself enough? Wouldn't it just result in boilerplate language disclaiming? Is that enough? Well, the auditors can say that they are not expressing their opinion on the internal controls. And they did procedures that were appropriate, at least that they believed were appropriate, in good faith, to gather confirmation of the existence of assets and the existence of receivables, the existence of cash, and as I said, challenge that. You're not saying that the boilerplate language in and of itself is sufficient to insulate your client, are you? I'm not saying that the boiler, that that totally insulates them. The question is what did they do in response to the internal control deficiencies that they noted in their opinion that are disclosed as well in the 10-K, as Your Honor pointed out a moment ago. And as the district court properly found, that DNTW did not simply accept the representations of management. And again, as we've gone through, they questioned the $18.8 million item. They questioned the $8.2 million item. They questioned, they sent out audit, rather, confirmations to independent third parties to confirm with them the existence of those assets. They received bank statements eventually from the client, but they weren't just taking the numbers off the client's books. They did get bank statements, and the bank statements themselves haven't been questioned here. So the court below looked at this overall and said we don't have here auditors who ignored their duties. We have an auditing firm that planned an audit, that attempted to carry out the audit, that may not have done everything they should have under the standards, but attempted in good faith to audit the financial statements. Not a sham audit, not a pretend audit, not a no audit at all, as one of the cases refers to it. A substandard audit, perhaps. And the district court noted that. But as many, many cases hold, that alone, the violations of auditing standards alone do not suffice to ground a strong inference of Auditor Siena. Your Honor. Am I correct, your red brief at 28 argues that the size of the client's alleged fraud should have no bearing, no bearing on the Siena inquiry. Is that your position? It is, Your Honor, and that is, if it's not no bearing, Your Honor, it's certainly not, in this case, sufficient to support an inference of Sienta. I mean, it's one thing to say it may not be dispositive on its own. It's another thing to say it has no bearing. Do you think it's that it's not dispositive on its own, or that it has no bearing? I'm trying to understand your position. I would say, in this case, Your Honor, the size of the fraud really does not have, well, I guess I would say it's not dispositive here, where there are so many indications that DNTW actually challenged the assertions made by management, did not accept their representations. And, you know, the cases hauled in there, we cite the cases there at page 28, advanced battery technologies, Stevenson, the Meridian Horizon Fund case, Your Honor, which involved the Madoff fraud, which, obviously, the most massive fraud of all time. And in those cases, the scope of the greatest Ponzi scheme of all time was held not to weigh decisively in favor of Sienta. Certainly, that's the Sabe fraud, the size of the Sabe fraud does not weigh in any dispositive way, or decisive way, or any real way that carries any weight on the question of Sienta with respect to DNTW. So, I'm running out of time. If the Court has any other questions, I'm happy to address them. Otherwise, I will close. Thank you. Thank you. You'll have one minute. Thank you, Your Honor. Just two brief points. I think the point with respect to the internal controls, there was a case cited in the briefs, Longtop, Southern District of New York case. I think the appellees had cited that to suggest, well, if you have internal control deficiency, that, in and of itself, is not supportive of Sienta. The difference between that case and this case is, in Longtop, Deloitte and Touche, although they were not hired to opine on material internal control weaknesses, they were aware of it. And as a result of being aware of it, they adjusted their audit procedures to have more scrutiny to take into account. That just did not, that didn't happen here. So that case, actually, I think, supports a finding of Sienta here. And lastly, the comment about the Madoff cases and the seriousness of the fraud, I think all of the Madoff cases are distinguishable because you had a situation there where people tried to hold auditors accountable for not the entity they audited, but some sort of feeder fund that came into that entity. And I think, correctly so, the courts have affirmed the dismissals in those cases. Thank you. Thank you. Thank you both for your arguments. The court will reserve decision. We'll hear.